```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA,

 5                    Plaintiff,

 6    -v-                                    Case No. 12-cr-20101

 7

      GREGORY McKNIGHT,
 8
                      Defendant.
 9    _____/

10

                              SENTENCING
11
                  BEFORE THE HONORABLE MARK A. GOLDSMITH
12
             Flint, Michigan, Tuesday, September 11th, 2012.
13

14

15    APPEARANCES:

16
      FOR THE PLAINTIFF:      A. TARE WIGOD
17                            U.S. DEPARTMENT OF JUSTICE
                              600 Church Street, Room 210
18                            Flint, MI 48502

19

20    FOR THE DEFENDANT:      EDWARD C. WISHNOW
                              240 Daines
21                            Birmingham, MI  48009-6241

22

23

24

25
```

1    (Appearances, continued):

2

3    FOR THE RECEIVER:        CHARLES E. MURPHY
                             ROBERT D. GORDON
                             151 South Old Woodward Avenue
4                            Suite 200
                             Birmingham, MI   48009
5

6

7    David B. Yarbrough, CSR, FCRR
     Official Court Reporter
8    (313) 410-7000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE

EXHIBITS

(Identified)          (Admitted)

NONE

```
 1            Flint, Michigan

 2            Tuesday, September 11th, 2012.

 3            At or about 2:45 p.m.

 4                    --      ---     --

 5            THE CLERK OF THE COURT:  Please rise.  Court is back

 6    in session.  You may be seated.  The Court calls case number

 7    12-20101, United States of America versus Gregory McKnight.

 8    Counsel, please state your appearances for the record.

 9            MR. WIGOD:  Good afternoon, your Honor.  Tare Wigod

10    on behalf of the government.

11            MR. WISHNOW:  Good afternoon.  Edward Wishnow on

12    behalf of the defendant who is present.

13            MR. WIGOD:  Your Honor, before we proceed with

14    sentencing, I would just inform the Court that there is a

15    victim present who would like to address the Court at the

16    appropriate time.

17            THE COURT:  All right.  Before we proceed further, I

18    assume both sides are urging the Court to accept the Rule 11

19    Plea Agreement?

20            MR. WIGOD:  The government is, yes, Judge.

21            MR. WISHNOW:  Yes, your Honor.

22            THE COURT:  Okay.  Mr. Wigod, why should the Court

23    accept this Rule 11 Plea Agreement?

24            MR. WIGOD:  Your Honor, I believe the plea agreement

25    properly balances the appropriate sentence in this case with
```

1    the cost of proceeding to trial and the expense of proceeding

2    to trial, expense and I use expense in not simply the monetary

3    word, but bringing victims in, having victims relive this and

4    expense to the government.  This would be quite a lengthy trial

5    with a lot of manpower involved.  So I think the sentence, a

6    sentence within the guidelines, specifically at the top of the

7    guidelines of approximately 15 years given the defendant's age

8    is an appropriate sentence given all the circumstances.  Any

9    additional sentence time, your Honor, simply I don't know would

10   outweigh the cost of the trial and again I use the cost in a

11   non-monetary sense.

12        THE COURT:  All right.  Mr. Wishnow, anything you

13   want to say regarding why the Court should accept this Rule 11

14   Plea Agreement?

15        MR. WISHNOW:  I concur with what the government

16   counsel said.  I believe it's a fair resolution to this

17   highly-complex case and it's really been pending on a Complaint

18   and pre-indictment information stage for about four years,

19   ongoing process by all counsel and S.E.C. and the receiver and

20   I believe that the government and the defense have reached a

21   fair resolution to this case as reflected by the guidelines.

22        THE COURT:  Now I know the sentencing was adjourned

23   at one point and I believe that after the adjournment

24   Mr. McKnight was supposed to testify in some proceeding?  Am I

25   right about that?

1        MR. WIGOD:  Yes, Judge.  There's a FINRA arbitration

2    that has been commenced by the receiver and the parties in that

3    case were hoping that Mr. McKnight would testify on behalf of

4    the receiver in recouping some funds.  That case has been

5    adjourned I think until approximately next April so, one, the

6    case has been adjourned well beyond the sentencing so that

7    adjourning the sentencing any further would not be fruitful and

8    two, I don't believe Mr. McKnight has been willing to assist in

9    that case, at least to date.

10        MR. WISHNOW:  Well, if I could address that.  I mean,

11    it's true we anticipated that there may be a deposition this

12    summer because that FINRA case was going to go to a hearing I

13    believe this fall and then for various legal reasons that's

14    been adjourned until April, but no, our representation at the

15    time that we sought the adjournment and my representation to

16    Charles Murphy who happens to be in court, he's with Clark Hill

17    who's representing the receiver in that arbitration case was

18    that Mr. McKnight was willing to be deposed on that case.

19        THE COURT:  So you say he is going to be deposed?

20        MR. WISHNOW:  There's no deposition yet set because

21    of the pendency of that case and I can't speak to that, but

22    maybe if the Court wants to address Charles Murphy who is

23    present with regard to that.

24        THE COURT:  All right.  Well, I understood Robert

25    Gordon is the receiver.  Is that right?

1        MR. WIGOD:  Yes, Judge.  Mr. Gordon is here.

2        THE COURT:  All right.  Well, is any part of the

3   reason the Court should accept the Rule 11 Plea Agreement any

4   assistance the defendant has given or is expected to give in

5   the location of assets or recovery of assets?

6        MR. WIGOD:  Judge, I don't -- to the, government

7   they're separate inquiries.  I don't believe that the

8   defendant's -- any level of cooperation that the defendant has

9   given to date has been minimal at best quite frankly.  He has

10  sat down with the government and when I say government, that

11  includes the U.S. Attorney's office, the S.E.C. and the

12  receiver and has provided information.  That information has

13  frankly not led to the recoupment of any funds.  Whether that's

14  because there are no funds out there to get or because he's not

15  being truthful is an open question.

16        As far as his cooperation in the future, I'm, I

17  believe that the receiver would still like Mr. McKnight's

18  cooperation in the FINRA arbitration.  I think they see him as

19  a rather integral part of that case, so as far as -- I don't

20  know if there's -- I'm unaware of a way in which the Court can

21  frankly enforce that.  Certainly --

22        THE COURT:  Enforce that or force that?

23        MR. WIGOD:  Enforce meaning if the Court were to go

24  ahead with sentencing today and with the consideration that

25  with the Court expects Mr. McKnight to testify at an

1   arbitration or be deposed and testify truthfully and if he

2   doesn't do that, I don't know that the Court can then come back

3   and change anything.

4        THE COURT:  Well, at this point I'm addressing the

5   question whether I should accept the Rule 11 Plea Agreement and

6   it wasn't clear to me in my review of the presentence

7   investigation report what if any assistance Mr. McKnight has

8   extended in the recovery of these losses.  So at this point I'm

9   not thinking in terms of enforcing anything, I'm simply

10  considering whether I should accept the Rule 11 Plea Agreement.

11       MR. WIGOD:  The only reason I mention that is because

12  I believe the Court had expressed something about future

13  cooperation, but if we set that aside, as I said, the defendant

14  has sat down and has explained his role in the scam.  When it

15  comes to which I don't believe amounts to just as a comparison

16  to substantial assistance under the guidelines.  We're nowhere

17  near that.  Whether his sitting down with the government or any

18  other party merits attention by the Court because as it relates

19  to the acceptance of the Rule 11, that's a separate question,

20  but he has sat down with the government, he has explained his

21  role in the scenario.

22       As far as recouping any assets, again, I don't know

23  that there's an open question as to whether there are assets

24  out there, that has not been concerned -- confirmed, so he

25  hasn't come forward with any assets.  We don't know frankly

1    whether that's because there are no assets out there or
2    because, umm, he's simply unwilling to do that.  I can say
3    there is money unaccounted for.  Whether we can trace that back
4    to the defendant is a different question, but as far as
5    recouping money, like a large pot of money where 15, 10 million
6    dollars sitting in an off-shore account, I can tell the Court
7    based on my review of the records I don't believe there's that
8    sum of money out there.  Any money being recouped would be
9    minimal because much of the money either went back to investors
10   because of by nature of a ponzi scheme and the receiver has
11   made certain efforts in trying to claw back some of the money
12   from those individuals and approximately 33 million dollars or
13   so was lost in investments so that money is gone as well.  So I
14   don't know that there's that much money out there to recoup,
15   but again he hasn't said that he's either willing or able to
16   give us any money.
17           THE COURT:  Has any money at this point been
18   recouped?
19           MR. WIGOD:  There's money that's been recouped
20   through claw-backs and the recovery of the defendant's assets
21   and things of that nature.
22           THE COURT:  And how much does that amount to,
23   approximately?
24           MR. WIGOD:  I believe a couple million dollars at
25   best.

1          THE COURT:  Couple of million?

2          MR. WIGOD:  Yes, I think two million.  I think the

3    receiver recently made a distribution with the authority of the

4    Court in the civil of 1.5 million?

5          UNIDENTIFIED SPEAKER:  Yes, we made a distribution in

6    junior companies.

7          MR. WIGOD:  Yes, there's a distribution of 1.5

8    million to pro rata to the victims and they're still, that case

9    is ongoing, they're still attempting to collect money, but as

10   far as collecting money net of any cost that the receiver has

11   is minimal, handful of millions of dollars.

12         MR. WISHNOW:  Can I be heard a little bit on this?

13         THE COURT:  Sure.

14         MR. WISHNOW:  Thank you, Judge.  There are no assets

15   that I know of that Mr. McKnight could inform any of the

16   parties, be it the receiver, the government, the S.E.C. that

17   are unbeknownst to them.  I know because I sat in on these many

18   meetings going back four years that we met and I suggested it

19   in my sentencing memo probably close to 30 hours of meetings,

20   many of which government counsel were involved in, I think

21   probably all of which Clark Hill lawyers were involved in, some

22   of which S.E.C., some of which Secret Service and it was a full

23   in my opinion debriefing of Mr. McKnight.  Now the Clark Hill

24   as the receiver has done significant work in trying to find and

25   marshal assets.  They've had, filed numerous lawsuits.

1        This Miami, this Florida case as I understand it,

2   there were significant monies given by Mr. McKnight to some

3   brokers in Florida which the receiver alleges was mismanaged

4   and in fact fraudulently, possibly even criminally.  They had

5   not been criminally charged, but lawsuits have been filed

6   against them and they are in FINRA arbitration attempting to

7   recover as I understand it the asset value that was given to

8   those people.  Unfortunately the nature of those investments

9   and some of the other investments that Mr. McKnight invested in

10  significantly depreciated so we don't have close to the amount

11  that was originally started with.  As Mr. Wigod said, possibly

12  he gave a figure of 33 million may have been lost because of

13  bad investments, depreciation and things of that nature.  So we

14  have what we have.  There is this minimal amount, I think of

15  1.5 million for distribution.  That's net after significant

16  costs, the receiver and the investigators and all they've done

17  which is considerable in attempting to marshal and to recover

18  assets.  So that's we are stand.

19        As far as I think the Court's inquiring what more can

20  he do?  Apparently -- well, I won't say apparently, he's

21  indicated a willingness to be deposed in this FINRA arbitration

22  case which is yet to, I think there's an April hearing date, no

23  set deposition date for him.  That's a significant case as I

24  understand it from my review of those pleadings trying to

25  recoup the losses from these brokers who acted inappropriately

1    in Florida, but I believe the government counsel is right.

2    After this Court imposes a sentence, whether it's today or

3    another date that the Court chooses, there is finality to a

4    criminal sentence in Federal Court and in fact the only vehicle

5    I know to review that sentence would be a Rule 35 motion for

6    substantial assistance, so there certainly would be finality to

7    a sentence whenever it's imposed.

8              THE COURT:  Did you have something else, Mr. Wigod?

9              MR. WIGOD:  No, your Honor.

10             MR. WISHNOW:  And your Honor, I forgot.  Government

11   counsel has suggested that Mr. McKnight's cooperation has been

12   minimal.  We take issue with that, that we believe it's far

13   more than minimal.  He sat down with them, gave them

14   significant information, gave them server and password

15   information which I understand and I just talked to the

16   receiver counsel today, they weren't able to get information

17   because of some, I think a bill was not paid and the server

18   erased the data that was on there, but that I don't believe

19   should fall on any, in any way upon Mr. McKnight for their

20   failure to get that and I'm not blaming them as well, it's just

21   the information that they sought was erased from this server,

22   but he did provide other information.  I sat in on these

23   briefings, over four years.

24             THE COURT:  All right.  Would either counsel have any

25   objection if the receiver or his representative answers some

1    questions of the Court?

2             MR. WIGOD:  I have no objection, your Honor.

3             MR. WISHNOW:  I don't believe so.  No, I don't.

4             MR. WIGOD:  Would you rather here from the receiver

5    or his representative?

6             THE COURT:  Whoever has got the most information on

7    the status of the recovery efforts and maybe it's more than one

8    person.  I don't think I need to swear anybody in.  I'm just

9    trying to get some information here so if you would identify

10   yourself for the record?

11            MR. GORDON:  Good afternoon, your Honor.  Robert

12   Gordon of Clark Hill.  I am the court-appointed receiver.

13            MR. MURPHY:  And your Honor, I'm Charles Murphy of

14   Clark Hill.  I'm representing the receiver in the FINRA

15   securities action and there's also a second Federal Court

16   matter pending before Judge Cook related to the FINRA matter.

17   It's involving the Royal Palm Limited Partnership so there's

18   two proceedings that will be involved if Mr. McKnight testifies

19   with respect to the transactions with the Florida broker

20   dealer.

21            THE COURT:  All right.  Well, I wanted to get some

22   information about what has been recovered and the prospects for

23   future recovery because one aspect of the Rule 11 Plea

24   Agreement is an agreement to a restitution figure of almost 49

25   million dollars so I wanted to get a sense on the issue of how

1    close to that figure we are likely to get.  I know we're

2    probably not going to get very close to it, but I wanted to get

3    a sense of, perhaps I should say how far away we're going to be

4    to the 49 million dollar figure, so maybe you can start with

5    what has been recovered to date and update me on what efforts

6    are being made to recover assets in the future to cover these

7    losses.

8            MR. GORDON:  Again for the record, Robert Gordon, the

9    receiver.  Your Honor, if I can try to summarize as best I can,

10   there have been recoveries from a number of different sources.

11   They're -- at the beginning of the commencement of the

12   receivership proceedings the Department of Justice had seized

13   and frozen certain electronic currency accounts in the name of

14   Legisi and ultimately we were able to receive approximately two

15   million dollars from those bank accounts.  We were also able to

16   liquidate certain futures, commodity futures trading accounts

17   that I think resulted in about 1.4 million dollars being

18   recovered by the receivership.

19           There, umm, Legisi had significant holdings of stock

20   in various thinly traded or not traded at all shell

21   corporations at the beginning of the case.  Somewhat

22   fortuitously one of those companies ultimately did become

23   registered on the stock, a stock exchange and trading commenced

24   in that, in those shares and we able to realize some revenue

25   through the liquidation of some of that stock.  My recollection

1    off the top of my head, your Honor, and it's just an estimate

2    is that we collected another maybe a million and-a-half dollars

3    through that process.

4            The remainder of the assets involved sundry pieces of

5    residential and commercial real property, primarily in the

6    Flint Swartz Creek area.  It has been a labor-intensive process

7    to market those properties as the real estate market is not, is

8    less than robust and to also try to make disposition of the

9    other stock holdings that we had.  We've also pursued

10   litigation against various parties as has been referred to.

11   One of the investments made by Legisi and it's counter to the

12   whole concept I would submit of liquid investments that would

13   be, lend themselves to making the kinds of monthly

14   distributions that the Legisi website promised in contravention

15   I would say or antithetical to that, Legisi invested some 10

16   million dollars in real estate in Florida and it turns out that

17   there was secured debt against those properties and a lack of

18   due diligence done by Legisi and there does not appear to be a

19   source of recovery from that asset, however there is litigation

20   against the parties that solicited the investment from

21   Mr. McKnight in those matters as well as parties who solicited

22   Mr. McKnight's investment in the thinly-traded stocks that were

23   inappropriate investments as well.  Some of those parties are

24   overlapping parties or related parties, business associates, et

25   cetera, so it seems that there's that certain common group of

1   people who are involved in soliciting investments from

2   Mr. McKnight and Legisi into these improvident and

3   inappropriate investments if you will.

4          We filed a motion in the spring to seek authority to

5   make a distribution interim or a partial distribution of monies

6   that we were holding to the victims.  At that time, we -- the

7   receivership estate had approximately 3.6 million dollars in

8   cash.  It had a few pieces of nominally valuable real estate.

9   It still had some significant shares in one particular company

10   that are trading at a very low level at this point

11   unfortunately and other than that, it had some judgments

12   against various defendants.  It had a few of these so-called

13   clawback actions that we are still pursuing against parties who

14   received more than they actually invested in the first

15   instance, what we are calling net winners so we are trying to

16   claw back monies to the extent that investors received back

17   more than their principal.  That is, those clawback actions

18   have resulted in a few hundred thousands of dollars and we're

19   still pursuing a few of those, but in any event, that's a sum

20   total of the assets that we were holding and then there's the

21   litigation that Mr. Murphy is heading up in the FINRA

22   arbitration matter as well as the, there's litigation against

23   the parties who solicit the investment in the real estate in

24   Florida.  That has actually been put on hold by Judge Cook in

25   the District Court in the Southern Division pending the FINRA

1    arbitration.  He felt that they should not proceed at the same

2    time so that has been held in abeyance while the FINRA action

3    proceeds.  So that is the sum and substance I believe your

4    Honor of the assets of the receivership estate at this point.

5             We made a distribution of one and-a-half million

6    dollars of the 3.6 million dollars in an effort to return money

7    and effectuate restitution to the extent we thought prudent at

8    this time.

9             We went through a claims process which was a very

10   difficult process to undertake because most of the trading,

11   most of the money that came into Legisi came in through those

12   e-currency accounts that are very difficult to understand and

13   trace, but through a laborious process we were able to

14   ultimately come up with what we believe is a final claims

15   roster, a roster of the claims that are valid and will

16   participate this distributions out of the receivership estate.

17   Those claims total just over 44 million dollars in claims held

18   by approximately 1,800 claimants.  Now there were three, we

19   believe there were roughly between three and 4,000 investors

20   originally, if you will call them investors, so there may have

21   been more victims than the 1,800, but the 1,800 represents

22   those victims who submitted claims that we were able to verify

23   were valid claims, but that's, umm, that gives some sense of

24   the size or the magnitude of the injury that's been caused,

25   roughly 1,800 claimants, roughly 44 million dollars and we at

1    this point have, you know, some assets that we are pursuing

2    prudently and pragmatically, but I think it is fair to say

3    regardless of how successful we are in this process or not,

4    that there will be ultimately a substantial economic loss

5    suffered by and a permanent loss suffered by these victims.

6          THE COURT:  If you are successful in the FINRA

7    litigation, do you have any guesstimate about what could be

8    recovered there?

9          MR. MURPHY:  Your Honor, the claim in that case is

10   for 20 million dollars.  The question is if there is a judgment

11   for that amount, whether we could collect it from the Sierra

12   Equity Company and the three persons who ran that entity.  That

13   was a small broker dealer in Florida.  They've essentially been

14   put out of business by FINRA for other regulatory problems that

15   they had.  A few of those tangentially touch upon their account

16   with Mr. McKnight, but the principal, Mr. Bloom, has been

17   permanently barred so he can't be in the securities industry.

18   Mr. Goddard had a suspension for a period of time and then

19   Mr. Lichtenstein was suspended for two years, so Sierra Equity

20   essentially went out of business.  Those three gentlemen though

21   earned substantial fees.  Their counsel claims that if we get a

22   judgment for 20, we may not be able to collect it.  We're

23   planning on doing a mediation in the next couple of months with

24   a JAMS mediator and then the matter's set for arbitration

25   hearing in April.  It was scheduled for this July, but it was

1    adjourned because of a separate lawsuit that was pending in

2    front of Judge Steeh.  There was also some opposition to our

3    attempt to schedule depositions by the opposition in the Sierra

4    Equity case and the FINRA arbitrators finally heard those

5    motions and gave us leave to schedule the deposition of

6    Mr. McKnight and several other individuals who are not subject

7    to FINRA jurisdiction where we have to get a federal order

8    absent cooperation to take video depositions in order to submit

9    them with our proofs in the FINRA case.  The FINRA claims are

10   based upon fraudulent transfer and securities fraud violations

11   and aside from Mr. McKnight's testimony regarding the account,

12   there's also evidence that the FINRA or the Sierra Equity

13   persons were aware that it was a ponzi scheme at the time they

14   were offering the securities and that testimony we plan to

15   elicit from another prisoner who's housed presently in the

16   Maxwell Air Force base in Montgomery, Alabama, but it was our,

17   it's our plan to take a video deposition of Mr. McKnight for

18   the FINRA case and for the Royal Palm federal case assuming his

19   unavailability as a result of the sentencing.

20         MR. GORDON:  Your Honor, if I could just clarify one

21   other thing I had discussed earlier?

22         THE COURT:  Sure.

23         MR. GORDON:  Thank you.  You asked or there was some

24   allusion to the servers and the password that was provided to

25   us and I just wanted to at least clarify on that point.  There

1    was -- Mr. McKnight did identify that there were two servers

2    that were involved in the business that were, had substantial

3    information and he did identify the location.  They were

4    located in Panama maintained by a company called High Security

5    and he did provide us with a password.  What I can tell you is

6    that our firm's information technology professionals tried to

7    copy that information and download it so we could have it

8    remotely and permanently at our firm and it was not possible to

9    do.  In the process of doing this within one month of being

10   provided with a password, High Security without any notice shut

11   down the servers and we reached out to the High Security and

12   they claimed that it was because of unpaid bills and we

13   suggested to them that if there were unpaid bills, we were

14   willing to pay those bills if they would reinstate the servers

15   and High Security said it was too late, that the servers had

16   been completely wiped out, so we never did get any information

17   from those servers.  The information that we've used has come

18   from, you know, documents and files that we obtained either

19   from the SEC's investigation or from the Legisi offices

20   themselves.

21        As far as other assets that are out there, it's, it

22   is I would agree with defendant's counsel that it's unknown

23   what is or is not out there.  We have seen indications of

24   attempts, of visits and attempts at dialogs with people in, for

25   example, the Turks and Caicos.  We've asked Mr. McKnight about

1    that.  He claims not to have any recollection of those things

2    so if there is, are other assets perhaps outside the country,

3    we have not yet been able to locate any of those nor have we

4    been provided with any information regarding that by

5    Mr. McKnight.

6         THE COURT:  So recovery at this point beyond what it

7    is you have already recovered is speculative at best?

8         MR. GORDON:  Yes, your Honor.  There is the stock

9    that is trading at I believe about 50 cents on the dollar, that

10   could be liquidated over a period of time, but for not very

11   much money, so I suppose that part's not completely

12   speculative.  There is something that can be sold for a few

13   hundred thousands of the dollars.  Other recoveries through

14   litigation or further investigation, yes, I would agree those

15   are all speculative.

16        MR. MURPHY:  Your Honor, with respect to the FINRA

17   defendants, their attorneys represented and I haven't seen all

18   of their financial data, that he's made the assertion that and

19   I've taken that with a grain of salt that we can't recover 20

20   million from them, but we could, umm, they're willing to talk

21   about a, and negotiate over a substantial settlement, but he

22   said it's well south of 20 million, but it does exceed several

23   million dollars in terms of their capability of making an offer

24   and we've talked with them about doing a mediation as I said

25   before where they said they'd be willing to share some

1    information with the mediator to convey to us.  We have seen

2    their tax returns and they did have substantial incomes during

3    the period of time that they were dealing with Mr. McKnight.

4         THE COURT:  Mr. Wigod, am I right that the Rule 11

5    agreement doesn't require the defendant to cooperate in any way

6    with the recovery process?

7         MR. WIGOD:  That is correct, your Honor.

8         THE COURT:  All right.  Are there any questions

9    either of the attorneys want to put to the receiver?

10        MR. WIGOD:  Nothing from the government, your Honor.

11        MR. WISHNOW:  I have a few, your Honor.  I think this

12   is mostly to Mr. Gordon.  Although you said the server

13   information and password information wasn't accessible from the

14   Panama servers, Mr. McKnight if you recall did meet with you,

15   me and others that I mentioned on numerous occasions, correct?

16        MR. GORDON:  That's correct.

17        MR. WISHNOW:  Yeah, and you were able to get this

18   roster of claimants through information that was provided

19   S.E.C. from his residence, I believe search warrant and other

20   information that he provided?  Would that be a fair statement?

21        MR. GORDON:  I believe that the claims roster was

22   generated primarily through e-bullion and e-gold account

23   information that was provided to us by the S.E.C..

24        MR. WISHNOW:  And that probably should be fairly

25   complete because the program required people to invest through

1    the e-currency manner.

2            MR. GORDON:  Umm, I, I -- that's a difficult question

3    to answer because the, by nature there's not much information

4    in the e-gold and e-bullion account in the business platform

5    which is why they've been shut down.  It's very hard to

6    identify who are account-holders and to trace money in and

7    trace money out.  Very good for money laundering, very bad for

8    financial accounting so I can't say that anything is really

9    complete from those records.  We simply did the best we could.

10           MR. WISHNOW:  But let me kind of rephrase it.  It's

11    fair, is it not, that according to the website of Legisi,

12    anyone that was going to invest monies had to do it through

13    e-currency as opposed to more traditional methods of currency

14    exchange, through a bank or wire, money order, wire order,

15    things of that nature?

16           MR. GORDON:  Yes, that's correct.  That's correct.

17           MR. WISHNOW:  Excuse me, Judge.

18          (Pause)

19           MR. WISHNOW:  You've talked to your partner, Jami

20    Statham, in regard to the user and password issue we're talking

21    about here?

22           MR. GORDON:  Yes, I have.  She's a colleague, an

23    associate.

24           MR. WISHNOW:  And Mr. McKnight is suggesting and my

25    recollection is that she was the point person in regard to that

1    with your firm as the receiver with regard to the user?

2         MR. GORDON:  I would -- that's fair to say that she

3    was most probably integrally involved of the attorneys in my

4    firm with trying to access that data, yes.

5         MR. WISHNOW:  Yes.  The information you're relaying

6    here, would that be information you received from her as far as

7    Mr. McKnight's input and help in that regard?

8         MR. GORDON:  Yes, that's fair.  It probably came

9    primarily through Jami Statham.

10        MR. WISHNOW:  Okay, so the impedes or roadblock if

11   you will was that the server had erased information because of

12   lack of payment?

13        MR. GORDON:  That's what we understand.

14        MR. WISHNOW:  Do you have any recollection of how

15   long the payment was made on these servers in relation to when

16   you as the receiver attempted to get information from the

17   server?

18        MR. GORDON:  No.  All I, what I recall being told is

19   that within a month of being, receiving the password, that the

20   servers were shut down so we had a very short window of time to

21   try to access that information before it was shut down without

22   notice to us.

23        MR. WISHNOW:  But would this have been a year or less

24   or more than after all this started your involvement being

25   appointed, I think it was May of '08 you were appointed?

1          MR. GORDON:  I don't recall.  I'm sorry, I don't know

2     that actual information.  I don't know the exact time frame.

3          MR. WISHNOW:  Okay, 'cause Mr. McKnight suggests that

4     a payment had been made for one year for those servers and that

5     wasn't like he stopped payment on short order after

6     commencement of the criminal Complaint and the S.E.C.

7     Complaint.  Do you have any observation on that?

8          MR. GORDON:  No, I couldn't corroborate or dispute it

9     either way.

10          MR. WISHNOW:  Thank you.

11          THE COURT:  Well Mr. Gordon, in your estimation,

12     would any information that the defendant has be of any

13     significant assistance in the recovery of assets?

14          MR. GORDON:  Your Honor, respectfully the question

15     would, umm -- well, let me say it this way.  First of all I

16     will give the caveat that I would defer to Mr. Murphy to the

17     extent that there's information he thinks would help him in the

18     ongoing litigation.  As to other assets, I'm not aware of other

19     assets so I don't know whether Mr. McKnight would have

20     information that would be helpful in that regard.  As I alluded

21     to and I will, you know, explicitly admit it's speculation at

22     this point, but we have seen that there are servers located in

23     Panama, there have been communications with Turks and Caicos,

24     we were -- we found an Estonian debit card for an Estonian bank

25     in the offices of Legisi when we took them over.  There seems

1    to be some indication of international financial activities

2    that we have not been able to trace and determine whether

3    there's any off-shore monies or not.  We just don't know.

4    Mr. McKnight's been asked if there are such monies.  He's

5    indicated there are not so I don't know where that takes us

6    exactly.

7            Umm, what else did I want to relay in that regard?  I

8    apologize, I'm trying to remember, umm, what other information.

9    Oh, the other thing I was going to mention, that is I can't

10   tell you what the magnitude is also of what might be out there

11   or not out there.  The S.E.C. did a wonderful job of trying to

12   trace, you know, monies coming in and monies going out and so

13   forth and I think they've accounted for a substantial portion

14   of that money and losses from investments and money put into

15   investments and so forth, but I think that there is at least

16   some consensus that it, you know, there are several millions of

17   dollars and I can't really describe the magnitude, but several

18   million dollars that aren't accounted for in that process and

19   that may or may not indicate that there's money somewhere else,

20   I just don't know.

21           THE COURT:  Okay.  Mr. Murphy?  Same question to you.

22           MR. MURPHY:  With respect to the litigation, your

23   Honor, I would have to state, you know, as the attorney

24   bringing the claim that it would assist our case if after we

25   compile the documents we intend to use as exhibits, that

1   Mr. McKnight answer questions about the history of his

2   involvement with the Sierra Equity people and the offer and

3   sale of those securities which total about 20 million dollars

4   of the funds from Legisi and he previously gave us a statement

5   with respect to his involvement.  At that time we did not have

6   complete discovery.  Since that time, we've obtained a lot more

7   documents from various sources, so to sit down with him and

8   have him review those documents and then answer questions for

9   those two cases would be helpful to us as claimants in those

10  cases.  Whether it constitutes substantial assistance, I'm not

11  that familiar with that standard under the rule and I can't

12  really --

13          THE COURT:  Well, I'm not asking any statement

14  regarding any particular rule.

15          MR. MURPHY:  Um-hmm.  It would assist us with our

16  meeting our burden of proof in those cases.

17          MR. WISHNOW:  If I could comment on that aspect, your

18  Honor?

19          THE COURT:  Sure.

20          MR. WISHNOW:  I do vividly recall that there was a

21  meeting with the receiver, I think Mr. Murphy was there as well

22  as Mr. Gordon and they did make inquiries of Mr. McKnight as

23  far as the Florida brokers, Sierra Equity certainly and the

24  others and I believe that he was forthcoming at that time, but

25  as Mr. Murphy says they now through discovery process have

1    documentation and other things that apparently would help them

2    in further questioning of Mr. McKnight.  Now I have not been

3    privy to that, not that I should have been, but I can see where

4    they would have gotten more information by now at this point.

5         Let me make one other comment and that is, you know,

6    the timing we have here, this case, S.E.C. and the criminal

7    Complaint started in the spring of '08 and I don't have to tell

8    anyone that's when the whole financial markets took a dive and

9    so whatever investments there were, were they good or were they

10   bad, took a huge financial hit at that time and so they were

11   significantly depressed and depreciated in value and that again

12   is another problem we have in recouping some of these assets

13   and investments.

14        THE COURT:  Well Mr. Murphy, has Mr. McKnight

15   resisted any efforts by you to get information from him?

16        MR. MURPHY:  Well, most of the documents we've

17   obtained have been through the S.E.C. investigation, but he

18   gave us a statement.  We don't have anything from him under

19   oath which is, was the purpose of scheduling his deposition.

20   He's not a subject to FINRA jurisdiction so he would either

21   have to cooperate or be issued a subpoena issued by a Federal

22   Court in order to testify in a FINRA matter.

23        THE COURT:  All right, and so his deposition will be

24   scheduled?  Is that your understanding?

25        MR. MURPHY:  That's correct.  There's been some

1   motions regarding when and essentially the order the FINRA

2   arbitrators was that we should take it before the arbitration

3   in April, but we have to cooperate in terms of scheduling the

4   date with the attorneys from New Jersey who are representing

5   the respondents in that matter.

6           There may be so the issue, the Royal Palm claims,

7   Royal Palm partnership claims, that was the real estate

8   investment for just under 10 million dollars, the claims

9   against the FINRA respondents are, encompass that, but there

10  are separate Royal Palm defendants in the Judge Cook matter.

11  The partnership itself, a partner at Greenberg Traurig and his

12  son and his wife who were involved in creating that investment

13  vehicle and managing it.

14          MR. WISHNOW:  Judge, if I may, could I consult with

15  counsel for a moment?

16          THE COURT:  Sure.

17          (Pause)

18          THE COURT:  We'll take a 10-minute recess at this

19  time.

20          MR. WISHNOW:  Thank you, Judge.

21          (Recess taken at 3:33 p.m.)

22          (Reconvened at 4:27 p.m.)

23          THE CLERK OF THE COURT:  Please rise.  Court is back

24  in session.

25          MR. WISHNOW:  Thank you, Judge.

1          THE CLERK OF THE COURT:  The Court recalls case

2    number 12-20101, United States of America versus Gregory

3    McKnight.

4          MR. WIGOD:  Tare Wigod on behalf of the government.

5          MR. WISHNOW:  Edward Wishnow for the defendant.

6          THE COURT:  All right, and the defendant is present.

7    The attorneys asked to meet with me in chambers along with the

8    receiver and Mr. Murphy.  I did meet with those individuals to

9    discuss the advisability of adjourning this sentencing and the

10   agreement was that we would adjourn the sentencing to November

11   19 at 1:30 p.m. and that there'd be a status conference October

12   23 at 9:30 a.m.  It was further agreed that one of the victims

13   who had traveled from South Carolina would be permitted to

14   speak at this time.  All that is agreed to?

15         MR. WISHNOW:  Yes, your Honor, on behalf of the

16   defendant.

17         MR. WIGOD:  Yes, your Honor.

18         THE COURT:  Mr. Wigod, who is the victim who traveled

19   from out of state?

20         MR. WIGOD:  His name is Robert Macomb, your Honor.

21         THE COURT:  Is he in the courtroom?

22         MR. WIGOD:  Yes, he is.

23         THE COURT:  All right, sir.  If you will tell us your

24   name please and tell us anything you would like in connection

25   with sentencing.

1          MR. MACOMB:  Okay.  Robert Macomb and I'm one of the

2    victims of Greg's scam.  I hope your Honor that you'll take

3    into consideration in treating him with as much compassion and

4    generosity as he's demonstrated to the investors and in

5    particular I was on the delegation for Legisi where we tried to

6    work with Greg on getting some things worked out on behalf of

7    the other investors and one of the investors named Tim Davis

8    had become so despondent over this loss that he committed

9    suicide and as a delegation, we asked Greg to consider giving

10   his widow something and Greg's response to us I think pretty

11   much tells what kind of person Greg is.  He said well Tim was

12   kind of a, he was kind of a mentally unstable person, period,

13   end of conversation.  So I hope that you'll take that into

14   consideration in dealing with this guy.

15          I think most of us have moved on.  We don't expect to

16   get a whole lot out of this, but the satisfaction of seeing

17   this man behind bars and for the maximum sentence, that would

18   be fantastic.  Thank you so much.

19          THE COURT:  All right.  Thank you for coming to court

20   today.  All right, Mr. Wigod, did you have anything else you

21   wanted to bring up?

22          MR. WIGOD:  Your Honor, I just wanted to address the

23   defendant's release status at this point in time and I had

24   expressed some of this in chambers, but I would ask that the

25   defendant be remanded pending the next sentencing hearing.  I

1  think the defendant, while not, hasn't exhibited evidence of
2  potential flight, things in court today I believe may have
3  given him additional incentive to flee, that being specifically
4  the Court's, the way I'm reading the Court, potential issues
5  with the length of term of incarceration.  I think that prison
6  absent a rejection of the Rule 11 by the Court is a fore-gone
7  conclusion in this case and if we are sentencing the defendant
8  or if we are adjourning the sentencing for the sole purpose of
9  having the defendant or one of the main purposes is having the
10 defendant testify in a FINRA arbitration so that the victims
11 may be able to potentially obtain more money, the only
12 guarantee that the defendant will be available for that
13 arbitration is to have him in custody.  So I would ask that the
14 Court remand the defendant pending the next sentencing date.
15         MR. WISHNOW:  Mr. Wigod's understanding of what we
16 discussed in chambers is different than mine.  My explanation
17 to the Court was we would agree to a sentencing adjournment as
18 long as the defendant remained out on bond, no remand and I
19 understood the Court would consider the government's request
20 for a tether and I would argue against that as well, but the
21 remand was not part of my understanding of whatever agreement
22 we had to adjourn this case.
23         MR. WIGOD:  Judge, I don't mean to -- just to be --
24 my understanding and I think it's important that we're all on
25 the same page was that I was going to ask for remand and the

1    Court can consider whatever options that it may including

2    putting the defendant on tether.  I don't know that one was

3    conditioned upon the other.

4           THE COURT:  Well, what did you want to say about

5    tether, Mr. Wishnow?

6           MR. WISHNOW:  This case has been pending since May of

7    2008.  Mr. McKnight has been totally cooperative with me, we've

8    met many times.  We've met many times as I explained to the

9    Court earlier with numerous government officials, AUSAs,

10   S.E.C.'s, Secret Service, receiver from Clark Hill and their

11   various lawyers, fully cooperative.  We have a significant

12   amount of people here in court, family members, community

13   members most of whom are church members including church elders

14   and I believe the minister from the church who are fully

15   supportive, supportive of Mr. McKnight and I believe that's a

16   great attestation as to their belief that he's someone who will

17   comply with the orders of the Court as I believe the Court --

18   as I believe he will as well.  I believe he understands and I

19   talked to him moments ago that a part of the adjournment is so

20   that he could cooperate with the government through the

21   deposition in the FINRA action and that's something that the

22   Court would be able to take into consideration at the time of

23   sentencing.  So I -- in essence, there's no risk of flight

24   which is certainly one of the standards of, primary standard

25   under the Bond Act.

1          THE COURT:  All right.  Well, I understand the

2    government's concern, but I don't think that it's necessary to

3    incarcerate the defendant at this time to assure his

4    appearance.  I think a tether would be sufficient to assure his

5    appearance so that's what I'll do.  I'll modify his order to

6    require a tether.  It's my understanding he's already

7    surrendered his passport.  Is that correct?

8          MR. WIGOD:  I believe that is correct, yes, Judge.

9          THE DEFENDANT:  Yes.

10         MR. WISHNOW:  Yes, your Honor.

11         THE COURT:  All right.  Are there any other

12   conditions that you'd want imposed, Mr. Wigod?

13         MR. WIGOD:  No, just that I would ask for a GPS

14   tether so that we'd know his specific location.

15         THE COURT:  Okay.  So that's what I'll order, a GPS

16   tether.  Is there Anything else?

17         MR. WISHNOW:  No, your Honor.  Is that done through

18   pretrial services in this building?

19         THE COURT:  Yes.  They'll let you know how it's going

20   to happen.  Anything else?

21         MR. WIGOD:  Nothing from the government, your Honor.

22   Thank you.

23         THE COURT:  Okay.  Thank you.

24         (Sentencing adjourned at 4:37 p.m.)

25                    --    ---    --



1                    C E R T I F I C A T E

2

3

4

5

6

7          I, David B. Yarbrough, Official Court

8    Reporter, do hereby certify that the foregoing pages

9    comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Tuesday,

11   September 11th, 2012.

12

13

14

15

16   2/18/2014                /s/ David B. Yarbrough

17   Date                     David B. Yarbrough, CSR, FCRR
                              600 Church Street
18                            Flint, MI  48502

19

20

21

22

23

24

25